IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LAVELL D. FLY | ) | |
| | ) | 4:09CV3194 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

This matter is before the court on the plaintiff's pro se appeal from the Social

Security Administration's denial of his request for disability benefits, Filing No. 1.  This is

an action for judicial review of a final decision of the Commissioner of the Social Security

Administration ("the Commissioner").  The plaintiff appeals the Commissioner's decision

to deny his applications for disability benefits under the Social Security Act ("the Act"), 42

U.S.C. §§ 401 *et seq.*, Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.,* and Supplemental

Security Income ("SSI").  This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383

(c).

Plaintiff Lavell D. Fly filed for Social Security disability benefits on October 10, 2006,

alleging an onset of disability as of that date.  *See* Filing No. 16, Social Security Transcript

of Proceedings ("Tr.") at 105-10, 132.[1]   His application was denied initially and on

reconsideration.  *Id.*, Tr. at 9.  Fly requested a hearing and appeared before an

administrative law judge ("ALJ") on February 5, 2009.  *Id.* at 20-53.  Thereafter, the ALJ

found Fly was not disabled within the meaning of Social Security regulations and denied

---

[1]References to page numbers are to the numbers at the bottom right hand corner of each page of the electronically-filed administrative record.  These numbers do not correspond to the page numbers of the PDF document.

benefits.  *Id.* at 6-19.  On August 4, 2009, the Appeals Council denied Fly's request for review of the ALJ's decision, which made the ALJ's decision the final decision of the Commission.  *Id.* at 1-3.

I.   BACKGROUND

A.   The Hearing

The evidence adduced at the hearing shows that  Fly is a divorced Native American Lakota Sioux male in his mid-50s who testified that he is homeless and lives in his car.  *Id.* at 24-27.  He weighs 370 pounds, and is 5 feet 11 inches tall.  *Id.* at 24.  He dropped out of eighth grade, but later obtained his high school equivalency degree (GED) while in prison.  *Id.*  He testified that he had been hospitalized in three mental institutions and had been diagnosed as mildly mentally retarded.  *Id.* at 39.  He testified he had trouble keeping up the pace on the job.  *Id.* at 25.  Also he stated that his hands cramp up, his shoulders hurt and his legs swell up and cramp.  *Id.*  He stated that his legs swell and are tender even when he does not work and that he has to be in the hospital three to five days at a time when his leg swells up.  *Id.* at 26.  He stated that his leg hurts and he has to "elevate it all the time."  *Id.* at 30.   He also stated that he has only been able to walk about a half a block since he has been taking blood pressure pills and can stand for less than 30 minutes before his knees and the bottoms of his feet start to hurt.  *Id.* at 33.

He also complained of hearing problems and lightheadedness and stated his blood-pressure medication made him "real tired."  *Id.* at 27.  He further stated he has chest pain when lifting heavy objects and starts breathing hard and sweating when he exerts himself.  *Id.* at 32.   He also testified that he once walked from Omaha to Lincoln, but later stated someone had given him a ride, and testified that he sleeps for only an hour and a half a

day.  *Id.* at 29, 31.  He testified his breathing problems worsened when he was in an automobile accident and punctured his lung and broke two ribs.  *Id.* at 33.

He testified that he had been fired from most temporary jobs he had.  *Id.* at 35. Further, he stated that the only jobs he ever had were heavy, manual labor jobs.  *Id.* at 35. Fly testified that his labor jobs aggravated his disability due to scaling flights of stairs and carrying heavy items such as iron pipes from one wall to the other.  *Id.* at 25.  He also stated that his boss would not permit him to take his potassium pills, which prevent the tightening of his muscles, or his blood pressure pills, which causes him to have severe coughing attacks.  *Id.* at 27.

Fly also testified that he did not presently drink or take drugs and that he had never done so in the past, but he alluded to mental problems that "they [psychiatrists] try to say that's drinking and stuff."  *Id.* at 39.  When asked if he had been violent, he stated he had not taken Paxil, which was the medication that was prescribed when he was in prison, and that when he does not take the medication he gets very violent.  *Id.* at 39.  Further, he testified he had gotten into fights and was banned for life from some food kitchens and homeless shelters.  *Id.* at 28-29.  He then testified that he has struggled with violent tendencies and begged for help at the Lancaster County Mental Health Center, but that "they didn't want to give [him] medicine."  *Id.* at 39.  He later testified, however, that he had been prescribed Paxil and was taking it at the time of the hearing.  *Id.* at 40.

A vocational expert, Dr. Michael McKeeman, also testified at the hearing.  *Id.* at 46-53.  The vocational expert testified that Fly had no past relevant work.  *Id.* at 47.  He was asked whether a claimant with disabilities similar to Fly's could perform work in the

national economy.[2]   *Id.*   The vocational expert responded that there "would be unskilled types of jobs that would fit that hypothetical that are in the sedentary exertional range," but that it was "nebulous as to whether he—how much light work he can do."   *Id.* at 49.   When pressed by the ALJ, the vocational expert added that he would "be inclined to think that the light work—he could do with the discomfort in his chest," stating that he based that conclusion on "the ability to stand and walk for six of eight hours."   *Id.*   He stated that those jobs would include food preparation work, packaging work, and stock clerking work.   *Id.* at 49-50.   He also testified that if the hypothetical claimant were required to elevate his leg for an hour during an eight-hour period, but not during normal breaks, he could not maintain employment.   *Id.* at 51.

Fly's friend, Norma Goodteacher, completed a supplemental information form.   *Id.* at 129-31, 142-44.   She reported that Fly had been in a mental institution located in Hastings, Nebraska, and at some point in another mental institution in Lincoln.   *Id.* at 144.   She  remarked that Fly needed a psychiatric doctor and medication because she believed

---

[2]Specifically, the ALJ asked:

This is an individual who's had right leg cellulitis, obesity, anti-social personality disorder, border line intellectual functioning, history of Post Traumatic Stress Disorder, has been diagnosed with psychosis NOS, and noted to have mood problems. This is an individual who has a history of hypertension, has generalized left knee pain, mild to moderate degenerative changes of the right shoulder.  Has also complained of bilateral knee pain.  This is an individual who's complained of chest discomfort.  This is an individual with a verbal IQ of 77, a performance IQ of 76, and a full scale IQ of 75.  Mild problems with activities of daily living, moderate problems with social functioning, mild problems with concentration, persistence and pace.  And no episodes of decompensation of an extended duration.  This is an individual who can do simple, unskilled work.  Avoid working involving strong interpersonal skills and complex instructions.  No heavy lifting.  No frequent kneeling and climbing.  No work with special training and special skills.  This is an individual who can lift 20 pounds occasionally, 10 pounds frequently.  Sit, stand and walk six out of eight.  Occasionally climb, kneel, crouch, crawl.  Can he perform work in the national economy?

*Id.* at 47.

4

he was crazy.  *Id.* at 131.  She also reported that he suffers pain in his knees and legs.  *Id.* at 142.  In addition, she reported that he was "slow," "don't think fast," and "has a mental block."  *Id.* at 144.

      B.   Medical Evidence

The medical evidence shows that Fly has been diagnosed at various times with gastritis, right leg cellulitis, venous stasis edema, severe; morbid obesity, gastroesophageal reflux disease, traumatic knee arthritis, hypertension, venous insufficiency NOS [not otherwise specified], edema, trauma arthropathy low left extremity, mild renal insufficiency, right groin adenopathy secondary to infection, renal ureter discord NOS, and left upper lobe atelectasis.  *See, e.g., id.* at 349, 265, 273, 274.  He has been prescribed Lasix, potassium supplementation, intravenous Cefazolin, Metroprolol, Furosemide, potassium chloride, Vancomycin, Lisinopril, Micardis, Toprol, ACE inhibitor, Paxil, and Risperdal.  *See id.* at 261-62.  The record contains objective evidence of severe valvular incompetence in the right common femoral vein and right greater saphenous vein.  *Id.* at 265.  There is also objective evidence of mild to moderate degenerative changes in his shoulders; mild areas of ischemia in the anterior and inferior walls of his heart.[3]  *Id.* at 458, 467.  Other objective testing indicates abnormal cardiolite and symptoms suggestive of angina pectoris.  *Id.* at 444.  He has also been prescribed compression hose and instructed to elevate his legs.  *Id.* at 288.

---

[3]Myocardial ischemia is inadequate circulation of blood to the myocardium, usually as a result of coronary artery disease.  Stedmans Medical Dictionary 211420 (27th ed. 2000), *available at* Westlaw STEDMANS.

On August 3 and 4, 2006, Fly was hospitalized for two days for right leg Cellulitis and severe Venous Stasis Edema.[4]  *Id.*, Tr. at 14, 261-65.  He presented at the emergency room with increased pain, redness, swelling of his right anterior shin accompanied by onset of chills and excessive sweating the night before.  *Id.*, Tr. at 261.  He also had increased pain with ambulation, a temperature of 100 degrees, and tender enlarged lymph nodes in the right groin area.  *Id.* at 261, 263, 265.  His final diagnoses were right leg Cellulitis; Venous Stasis Edema, severe; Morbid Obesity; Gastroesophageal Reflux Disease; Traumatic knee Arthritis; and Hypertension, newly treated.  *Id.* at 261.

On August 10, 2006, Fly was again hospitalized for worsening cellulitis.  *Id.* at 270. Medications were changed, resulting in marked improvement in his erythema and pain. *Id.* at 270.  On August 22, 2006, Fly reported to the Nebraska Urban Indian Medical Center that his cellulitis was "much better" and noted his blood pressure to be improving.  *Id.* at 287.[5]

Fly reported that he was once assessed as having an IQ of 67.  *Id.* at 116.  He also reported that he worked informally in prison assisting other inmates with their legal cases. *Id.* at 231.  Fly also reported that his symptoms include "that little voice in my mind that says do this do that."  *Id.* at 118.  Fly also stated that his legs and feet periodically swell up twice the normal size and makes him unable to move for a period of a week or two.  *Id.* at 145, 147.

---

[4]Venous stasis is impairment or cessation of venous flow.  *See* Farlex, Inc., *The Free Dictionary*, http://medical-dictionary.thefreedictionary.com/venous+stasis (last visited June 22, 2011).

[5]An IQ range of 71 to 84 "is characterized as 'borderline intellectual functioning' and is considered to be one step above mild retardation."  *Moore v. Astrue*, 623 F.3d 599, 601 (8th Cir. 2010).  An IQ score in the high 60s is a range associated with mild retardation.  *Id.*

In early 2007, at the Commissioner's request, Dr. Roderick Harley examined the medical evidence and prepared a physical residual functional capacity ("RFC") assessment. *Id.* at 371-78. He noted that the claimant's credibility was not at issue, rather the determination hinged on duration of the claimant's disability.[6] *Id.* at 376. Addressing the diagnoses of cellulitis and obesity, he found Fly had the following exertional limitations: he could occasionally lift 50 pounds and frequently lift 25 pounds, and could stand and walk and sit for six hours in an 8-hour day. *Id.* at 371-78.

The medical evidence also shows that, as part of a psychological evaluation in July of 2005, Fly reported that he was diagnosed at age 16 as mentally retarded. *Id.* at 232. He stated he had been committed to the Hastings Regional Center for two years from 1973 to 75. *Id.* He also stated he was committed to the Lincoln Regional Center and spent six months on the maximum security ward now known as Forensic Mental Health Services. *Id.* At age 17, he was charged with "stabbing with intent to kill, wound, or maim" and was sentenced to 15 years at the Nebraska State Penitentiary. *Id.* He also reported that he has experienced emotional difficulties that stem from witnessing the fatal shooting of his brother and his infant nephew "killed during a big shoot out with the police in Alliance" in 1973. *Id.* The record shows that, in total, Fly was incarcerated for 28 years. *Id.* at 231.

---

[6]Specifically, he stated:

This [claimant] has [medically determinable illnesses] of acute left knee pain, and right leg cellulitis. Obesity is also a factor, and duration is a factor as well. This [claimant] had an onset of leg cellulitis in 8/06 that required admittance to the hospital to start appropriate treatment. [Claimant] is showing improvement with proper meds and treatment. From [acute onset date] to 8/06, this [claimant] should have had the ability for at least "light" work activity, and projected to 8/07, he should have the ability for "light" work activity. As duration is an issue, credibility is not in question.

*Id.* at 376.

Fly also reported that he had been in a car accident in 2004 and suffered a head injury. *Id.* at 233. He stated that he was in surgery for six hours but was released the following day.[7] *Id.*

Dr. A. Jocelyn Ritchie, the consulting psychologist who conducted the evaluation, found Fly functioned "in the low end of the Borderline Intellectual Functioning range." Tr. at 235. Dr. Ritchie noted that Fly's "insight" and "judgment based on his history" were both "poor." *Id.* at 234. She noted that Fly's working memory was moderately impaired. *Id.* at 235. Dr. Ritchie opined that Fly had no restrictions in activities of daily living, could remember and understand short and simple instructions, and could adapt to changes in his environment, but also "qualified" her response. *Id.* at 235-36. She answered a "qualified yes" to the inquiries about difficulties in maintaining social functioning and recurrent episodes of deterioration when stressed, and a "qualified no" to the inquiry, "is there ability to sustain concentration and attention needed for task completion?" *Id.* at 235. She also answered a "qualified yes" to whether Fly had the ability to relate appropriately to co-workers and supervisors, ability to adapt to changes in environment and the ability to handle his own funds. *Id.* at 236. There was no explanation of the meaning of the qualified responses. Her report indicates that the medical disposition was based on the following categories: 12.01 - Organic Brain Disorders; 12.04 - Affective Disorders; 12.06 Anxiety-related Disorders; and 12.08 Personality Disorders.[8] *Id.* at 238. Dr. Ritchie's

---

[7]The record shows that Fly was involved in another automobile accident in March 2005 and he was treated at Bryan L.H. Medical Center West and released. *Id.* at 208-230. He returned to the emergency room several days later complaining of pain and a chest x-ray at that time revealed mild atelectasis with scarring in the left mid-lung and a possible fracture of the left seventh rib. *Id.* at 189.

[8]Those categories correspond to the Listings. See 20 C.F.R. pt. 404, subpt. P, app. 1.

8

report shows that Fly has a history of significant aggression and trouble getting along with others. *Id.* at 235. Dr. Ritchie gave Fly a Global Assessment of Functioning ("GAF") score of 55, consistent with moderate symptoms.[9] *Id.* at 236.

On December 18, 2006, William R. Stone, Jr., Ph.D., a consulting psychologist, evaluated Fly. *Id.* at 347-52. Dr. Stone indicated that mental problems had been alleged but that no records were available. *Id.* at 347. Fly reported that the Lincoln Regional Center had determined he was incompetent and treated and released him in 1976. *Id.* at 348. Fly also told Dr. Stone that while in prison he was treated with Paxil, an antidepressant, which gave him feelings of wanting to commit suicide. *Id.* He stated that he has trouble adjusting to society, such as getting into fights, and has problems getting employment or, when he does get employed, his bosses say he is too slow and cannot keep up with the pace. *Id.* Fly reported a long history of violent altercations. *Id.* at 347. Fly also stated that he has eight prescriptions for blood pressure, pain, and swelling, but that he is not regularly taking the medications. *Id.* Dr. Stone's report shows that Fly is essentially homeless. *Id.* Fly reported that he sleeps on the streets in warm weather and a friend sometimes lets him use the shower and stay overnight when it is cold; the Indian Center provides Fly some meals on a regular basis. *Id.* at 349. He reported that he gets temporary jobs that only last for an hour or two, so much of his time is unoccupied. *Id.* at 349.

---

[9]The GAF is a numerical assessment between zero and 100 that reflects a mental health examiner's judgment of the individual's social, occupational, and psychological function. *Kluesner v. Astrue*, 607 F.3d 533, 535 (8th Cir. 2010). A GAF scale score of 51-60 reflects the clinician's opinion that a patient has moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 1994).

Based on Fly's vocabulary and sentence structure, but not objective tests, Dr. Stone found Fly's intellectual functioning to be in the average range. *Id.* at 350. That estimate was based on Fly's report that he had completed high school while in prison and the statement that he liked reading law books. *Id.* at 350. Dr. Stone noted, "on the other hand, he is also reporting that he had an IQ of 75 when formally assessed at the Lincoln regional Center many years ago." *Id.* at 350.

Dr. Stone noted that Fly's "mental status is unclear" since it can be implied that in the past that he had a very severe mental illness and impaired cognitive functioning. *Id.* at 351. Dr. Stone's diagnosis was Anti-Social Personality Disorder and reported Morbid Obesity. *Id.* at 351. In addition, Dr. Stone noted that Fly's history "strongly suggests that he had some serious mental illness, even symptoms of major mental illness." *Id.* He also noted that Fly's apparent inability to adapt to the highly structured environment of prison "raises questions about whether he may have significant psychiatric problems." *Id.* at 350. Dr. Stone did not rule out the possibility of Intermittent Explosive Disorder or some other condition that is contributing to his violent outbursts. *Id.* at 351.

Dr. Stone gave Fly a GAF score in the 51-60 range, indicating moderate symptoms, primarily as a result of his antisocial attitude and anger problems. *Id.* Dr. Stone opined that Fly was psychologically capable of performing basic daily living tasks and was maintaining minimally adequate superficial social contacts. *Id.* He was able to sustain concentration and attention and capable of relating appropriately to coworkers and supervisors on a superficial basis. *Id.* He found Fly was capable of adapting to ordinary changes in his environment, managing his own funds, and understanding and remembering short and simple instructions, probably even relatively complex and

complicated instructions.  *Id.*  However, he noted that records from the Regional Center would be helpful.  *Id.*

On January 8, 2007, Jennifer Bruning-Brown, Ph.D., a psychologist, examined the record and completed a Mental RFC assessment.  *Id.* at 353-55.  She indicated that Fly was not significantly limited in 16 of 20 areas of mental functioning, but was "moderately" limited in four areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to work in coordination with or proximity to others without being distracted by them; and the ability to interact appropriately with the general public. *Id.* at 353-54.   Dr. Bruning-Brown also completed a Psychiatric Review Technique Form ("PRTF").   *Id.* at 357-70.  She indicated Fly had mild limitations in his activities of daily living; no difficulties with maintaining concentration, persistence, or pace; no repeated episodes of decompensation; and moderate difficulties in maintaining social functioning.  *Id.* at 367.  Patricia Newman, Ph.D., a consulting psychologist, examined the evidence and concurred in the Dr. Bruning-Brown's conclusions.  *Id.* at 393.  A disability worksheet notation dated 11/20/06 indicates that records from the Nebraska State Penitentiary were not requested as "out of [development] period."  *Id.* at 380.

On January 9, 2007, Roderick Harley, M.D., a consulting physician, completed a Physical RFC assessment.  *Id.* at 371-79.  He found that Fly should be able to perform medium "light" work activity.  *Id.* at 371-79.  Glen Knosp, M.D., reviewed the file on March 9, 2007, and found:

> No additional evidence submitted pertaining to physical allegations.  Xray of
> RLE [right lower extremity] in 8/06 showed no evidence of bony
> abnormalities.  WE has shown that the problem w/ legs swelling has
> responded to treatment.  His ADLS [activities of daily living sheets]  have
> shown that he can drive for 300 miles at a time, and is able to walk, although

slowly.  There is no indication to change initial RFC assessment.  He remains capable of a narrowed range of medium work.  I have reviewed all of the evidence in file and the RFC of 1/9/07 is affirmed as written.

*Id.* at 391.

Fly was treated at the Community Mental Health Center of Lancaster County, Nebraska, in early 2007.  *Id.* at 386-90.  The report of a pretreatment assessment by a team of mental health practitioners shows that Fly reported that he was visited by a spirit while in prison and the spirit instructed him to do things, usually aggressive things against the guards.  *Id.* at 386.  He also reported that he had special powers to "manipulate the court system."  *Id.*  Fly denied any history of substance abuse, but the report indicates that "when records were faxed from the Lincoln Regional Center they indicated a long history of alcohol and marijuana abuse."  *Id.* at 387.

The result of the pretreatment assessment was a diagnostic impression of Psychotic Disorder, not otherwise specified, along with "rule out" (R/O) diagnoses of "Schizophrenia, Single Episode in Partial Remission, Unspecified Pattern; Post-traumatic Stress Disorder, Chronic; and Anti-social Personality Disorder."[10]  *Id.* at 388.  Also, mild mental retardation "per self report" and borderline intellectual functioning were diagnosed.  *Id.*  A GAF of 51 was assigned.  *Id.*  The report noted that:

> Further evaluation is recommended to rule out Post-traumatic Stress Disorder, and Schizophrenia, Single Episode in Partial Remission, Unspecified Pattern based on Lavell's report of flashbacks, witnessing traumatic events, inability to sleep, having visual hallucination that may be explained by these disorders.  Review of previous records and a further evaluation will aid to clarify this diagnostic picture.

---

[10]A "rule-out" diagnosis is not a diagnosis. *Amaro v. Astrue*, 2011 WL 871474, *4 n.4 (C.D. Ca. 2011). In the medical context, a "rule-out" diagnosis means there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out.  *Id.*; *see also Hansen ex rel. J.H. v. Republic R-III School Dist.*, 632 F.3d 1024, 1028 n.3 (8th Cir. 2011).

*Id.* at 389.  The assessment and diagnoses were reviewed by Dr. Stephen Paden, who found treatment was medically necessary.  *Id.* at 390.

Records of a diagnostic interview in May 2007 indicate that Fly was referred to the Community Mental Health Center by the hospital.  Dr. Paden conducted the mental status exam and found "he denies any substance abuse, although records certainly indicate that." *Id.* at 400.  He noted Fly had problems with grandiosity and "special powers."  *Id.*   Dr. Paden diagnosed borderline intellectual functioning and Psychosis, NOS, and ruled out diagnoses of Schizophrenia and substance abuse.  He assigned Fly a GAF score of 50, which indicates serious symptoms.[11]  *Id.* at 400-401.  The score reflected Fly's anger and depression problems in addition to grandiosity and "special powers."  *Id.*

On July 6, 2007, Richard Gustafson, M.D., a primary care treating physician, examined Fly who returned for follow-up on his blood pressure and noted that his hypertension was under fair control.  *Id.* at 15, 457.  Dr. Gustafson noted muscle cramps, blisters on his feet, and possibly a fungal infection between Fly's toes.  *Id.*

On December 14, 2007, a right shoulder x-ray revealed degenerative changes at the right acromioclavicular joint, mild to moderate hypertrophic changes, and prominent joint space narrowing, but there was no evidence of acute bony abnormalities. *Id.* at 458. Fly reported a flare-up of orthopedic bilateral shoulder complaints after working a construction job.  *Id.* at 450. Dr. Gustafson observed that Fly's upper extremity exam "shows really fairly poor effort as far as checking strength and ROM [range of motion] . . .

---

[11]A GAF score of 50 reflects serious limitations in the patient's general ability to perform basic tasks of daily life.  *Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003)  (noting that the vocational expert considered a claimant with a GAF of 50 unable to find any work).

it is really hard to tell if he has any significant rotator cuff tear or isolated weakness because really everything I check is weak." *Id.* at 450.   On February 15, 2008, Dr. Gustafson stated that Fly's right shoulder pain did not warrant surgery and he discussed symptomatic measures Fly could use when his shoulders flared up. *Id.* at 447.   In addition, the report stated that Fly's hypertension was not well controlled. *Id.*

On July 9, 2008, Todd J. Tessendorf, M.D., a treating physician, performed a cardiac evaluation because Fly reported substernal chest discomfort that was exacerbated by physical activity. *Id.* at 459-60.   Dr. Tessendorf noted that a nuclear scan showed "mild" areas of ischemia in the anterior and inferior walls with a normal ejection fraction, but also reported chest pain with "recent abnormal nuclear stress test." *Id.* at 459.   On July 22, 2008, Fly underwent a cardiac catheterization which revealed normal coronary arteries and normal left ventricular function, with an ejection fraction of 60%. *Id.* at 467.   An ECG was also normal. *Id.* at 466.

C.   The ALJ's Finding

The ALJ found that Fly was not disabled. *Id.* at 6-53.   She found that he had the "following severe impairments:   right leg cellulites (sic),[12] anti-social personality disorder; borderline intellectual functioning; history of post traumatic stress disorder, a mood disorder with psychosis, not otherwise specified, history of hypertension, generalized left knee pain, mild to moderate degenerative changes of the right shoulder, bilateral knee pain, and complaints of chest discomfort." *Id.* at 11.

---

[12]Cellulitis is "Inflammation of subcutaneous, loose connective tissue (formerly called cellular tissue). Stedmans Medical Dictionary 68620 (27th ed. 2000), *available at* Westlaw STEDMANS.

14

She found, however, that Fly's impairments or combination of impairments did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. 416.925 and 416.926 ("the Listings").  *Id.* at 12.  She discussed only the listing for mental retardation and found that Fly's mental impairments, singly and in combination, did not meet or medically equal the criteria of that listing.  *Id.* at 12; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  In making that finding, she noted that Fly's condition did not meet either the paragraph B criteria or paragraph C criteria of that listing.  *Id.*  She considered "the opinions of the state-appointed medical consultants who evaluated this issue prior to the hearing and who likewise concluded that the claimant's impairments did not meet or equal the in severity the criteria of any listed impairment."  *Id.* at 13.  She gave "significant weight" to the opinion of Dr. Stone, a consulting psychologist and "some weight" to the opinion of Fly's treating psychiatrist, Dr. Paden, finding that "over the longitudinal period, the claimant is no more limited than described in the residual functional capacity."  *Id.* at 17.

The ALJ concluded that Fly had "the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b), except the claimant has a verbal IQ of 77, a performance IQ of 76, and a full scale IQ of 75."  *Id.*  Further, she found that Fly has

> mild problems with activities of daily living, moderate problems with social functioning, moderate problems with concentration, persistence, and pace, and no episodes of decompensation.  The claimant can perform simple and unskilled work, but must avoid work involving strong interpersonal skills and complex instructions.  The claimant cannot engage in heavy lifting, nor do more than occasional kneeling, climbing, crouching or crawling.  He cannot do any work requiring special training or skills.  He must be allowed to alternate positions at regular breaks.  He can only occasionally lift above the head.

*Id.*  Based on the testimony of the vocational expert, the ALJ found that Fly had the RFC to perform work that exists in significant numbers in the economy. *Id.* at 13, 18.

15

In reaching this conclusion, the ALJ evaluated the medical evidence in light of Fly's subjective allegations of pain, and determined that Fly's testimony was not fully credible and not supported by the record. *Id.* at 15. She noted that Fly "complained of significant pain after a November 2006 accident, but he was able to walk fine and the examination did not support investigation by x-ray." *Id.* at 15-16. Further she found that Fly's treating physician's observations of only "mild" changes and "blisters" on the bottoms of his feet suggested that Fly "was involved in greater physical activities than contemplated by the above residual functional capacity." *Id.* at 16. Also she noted that Fly "takes no prescription medications which is inconsistent with the extent of his alleged pain and limitations." *Id.* She found his credibility "severely eroded by his poor effort during a December 2007 exam and his later admitted ability to control his pain by non-medicinal means." *Id.*

With regard to Fly's alleged mental problems, she found him "not as limited as he alleges." *Id.* at 17. She noted that "[t]he record does not indicate that the claimant has ever required acute or inpatient hospitalization for mental illness." *Id.* She noted that she was "impressed that Dr. Gustafson, the claimant's primary care physician did not recommend more serious therapy from a mental health specialist" and noted that he "only takes Paxil." *Id.* She concluded "The claimant's lack of effort in his exams as well as his belief that he can manipulate courts, raises questions about his motivation and supports a finding that the claimant is not fully credible regarding his alleged mental problems." *Id.*

Fly appealed the ALJ's determination and the record indicates that additional medical evidence was submitted to the Appeals Council, but it does not appear in the record. Correspondence from counsel to the Appeals Council indicates:

16

Mr. Fly has informed our office that he has sought additional medical/psychiatric care since the hearing held February 5, 2009. Specifically, Mr. Fly has continued to treat with Community Mental Health Center of Lancaster County for his mental health needs: Enclosed is the March 23, 2009 letter Mr. Fly received from Lisa Young, MSN, APRN, BC in which she opines that Mr. Fly suffers from Schizoaffective and Post Traumatic Stress Disorder, which renders Mr. Fly unable to hold, seek or secure gainful employment. I have requested updated records from this facility, as well as a report from Dr. Sanat Roy, who is the Medical Director overseeing Ms. Young. I will provide that documentation to you upon receipt for consideration in Mr. Fly's appeal.

*Id.* at 4. The Appeals Council decision indicates that the Appeals Council reviews cases if "we receive *new and material* evidence and the decision is contrary to the weight of all the evidence" and stated that it had "considered the reasons you disagree with the decision." *Id.* at 1 (emphasis in original).

## II.  LAW

In an appeal of the denial of Social Security disability benefits, this court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole'" and "'may not reverse . . . merely because substantial evidence would support a contrary outcome.'" *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011) *(quoting Dolph v. Barnhart*, 308 F.3d 876, 877 (8th Cir. 2002).  Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. *Id. (quoting Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010)).

A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence

17

supporting the [Commissioner's] findings," *Hunt v. Massanari*, 250 F.3d 622, 623 (8th Cir. 2001) (internal quotations and citations omitted), and "requires a scrutinizing analysis, not merely a 'rubber stamp' of the [Commissioner's] action." *Cooper v. Sullivan*, 919 F.2d 1317, 1320 (8th Cir. 1990). The court must consider evidence that detracts from the Commissioner's decision in addition to evidence that supports it. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

The court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). The court owes no deference to the Commissioner's legal conclusions. *See Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008).

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. . . ." *20 C.F.R. § 404.1505*. To determine whether a claimant is disabled, the Commissioner must perform the five-step sequential analysis described in the Social Security Regulations. *See* 20 C.F.R. § 404.1520(a). Specifically, the Commissioner must determine: "(1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to [his] past relevant work; and (5) whether the claimant can adjust to other work in the national economy." *Tilley v. Astrue*, 580 F.3d 675, 678 n.9 (8th Cir. 2009)*; see also Kluesner v. Astrue*, 607 F.3d 533, 536-37 (8th Cir. 2010). "Through step four of this analysis, the claimant has the burden of showing that [he] is

18

disabled." *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008).  Once the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform." *Id.*

The determination of a claimant's RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, i.e., eight hours a day, five days a week, or an equivalent work schedule. See Soc. Sec. R. 96-8p (1996).  RFC is not based solely on "medical" evidence; rather, the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of the limitations.  *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).  When a claimant suffers from exertional and nonexertional impairments, and the exertional impairments alone do not warrant a finding of disability, the ALJ must consider the extent to which the nonexertional impairments further diminish the claimant's work capacity.  *McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir.2003) (quoting *Lucy v. Chater*, 113 F.3d 905, 908 (8th Cir.1997)).

"[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'"  *Prosch v. Apfel*, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) *(quoting* 20 C.F.R. § 404.1527(d)(2) (2006)).  The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d at 961.  The opinion of a consulting physician who examines a claimant once or not at all does not

19

generally constitute substantial evidence. *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir. 1998). An ALJ cannot substitute his opinion for the medical opinions. *Ness v. Sullivan,* 904 F.2d 432, 435 (8th Cir. 1990).

In determining whether a claimant is disabled, the ALJ is not entitled to presume that obesity is remediable or that an individual's failure to lose weight is "wilful." *Stone v. Harris,* 657 F.2d 210, 212 (8th Cir. 1981) (characterizing the "notion that all fat people are self-indulgent souls who eat more than anyone ought" as nothing more that "baseless prejudice of the intolerant svelte"). ALJs are to consider the combined effects of obesity when evaluating disability. Soc. Sec. R. 02-1P, 2000 WL 628049, *1 (Sept. 12, 2002). Obesity may, by itself, meet or equal a listed impairment. *Id.* at *5. Obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. *Id.* (noting that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.)

The Medical-Vocational Guidelines, a grid that accounts for an individual's RFC and various other vocational factors, such as age and educational background, is included in the regulations to provide guidance at step five of the sequential analysis. *See* 20 C.F.R. pt. 404, subpt. P, app. 2. "Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. Pt. 404, subpt. P, app. 2, § 200.00. If a mental impairment affects the claimant's ability to meet job demands other than strength, the Medical-Vocational Guidelines are not directly applied but "provide a framework to guide [the]

20

decision."   20 C.F.R. § 404.1569a(d).   Under the Medical-Vocational Guidelines, an individual who is "closely approaching advanced age"—that is, age fifty to fifty-four—is disabled if his maximum sustained work capability is limited to sedentary work as a result of severe medically determinable impairments and he has "limited or less" education or is a high school graduate or more without a recently completed education that provides for direct entry into sedentary work, and he has no past relevant work experience or only unskilled work experience.   *See* 20 C.F.R. § 201.00(g) and Table 1.

A vocational expert's testimony constitutes substantial evidence only when it is based on a hypothetical that accounts for all of the claimant's proven impairments.   *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010).   "The hypothetical 'need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the concrete consequences of those impairments.'"   *Id.* (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (internal quotation omitted)).   A vocational expert must take a claimant's medical limitations into account and offer an opinion on the ultimate question whether a claimant is capable of gainful employment.   *See Kelley,* 133 F.3d at 589.

A claimant's subjective complaints may be din the record as a whole, but the ALJ may not discount subjective complaints of pain solely because they are not fully supported by objective medical evidence.   *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005).   When assessing the credibility of a claimant's subjective allegations of pain, the ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions.   *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th

Cir.1984). When an ALJ rejects a claimant's complaints of pain, he or she must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the *Polaski* factor. *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

"'[S]ocial security hearings are non-adversarial,' and an ALJ has a duty to fully develop the record, even when the claimant is represented by an attorney." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir.2004). Accordingly, "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped." *Id.* However, the ALJ is required to order medical examinations and tests only if the medical records presented do not give sufficient medical evidence to determine whether the claimant is disabled. *Id.*

## III. DISCUSSION

The issue before the court is whether there is substantial evidence based on the record as a whole, to support the ALJ's conclusion that, considering Fly's age, education, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the economy that Fly can perform. The court finds that there is not.

The ALJ erred in several important respects. First, she failed to adequately develop the record. There was credible evidence that Fly had received extensive mental health treatment in the past. Several treating as well as consulting mental heath professionals noted that the records were necessary. There is no support for the ALJ's assertion that there was no indication that Fly had ever had inpatient mental health treatment. Fly testified to that fact, reported it to healthcare practitioners, and the fact was corroborated by the statement of his friend. Fly was given "rule out" diagnoses of several serious mental

22

illnesses.  His history and present homeless situation supports those diagnoses.  Further, the ALJ erred in not obtaining physical and mental RFC assessments from Fly's treating physicians.  The ALJ improperly credited the opinions of consulting psychologists and physicians over the diagnoses and reports of Fly's treating physicians and psychiatrists. The ALJ improperly relied on the report of consulting physicians who had never examined Fly, and had only reviewed medical records, to establish Fly's physical residual functional capacity.

Further, the ALJ erred in failing to credit Fly's subjective complaints.  The court finds that the record contains objective evidence that supports Fly's subjective reports of debilitating leg pain and swelling.  There is objective evidence that Fly suffers from severe valvular incompetence in his lower extremities.[13]  The ALJ committed further error by failing to consider the effect of Fly's morbid obesity on his other conditions.  Fly has been diagnosed with morbid obesity by every doctor who has examined him.  The ALJ did not address Fly's morbid obesity in the contest of his exertional limitations, nor did she acknowledge the physical limitations that would result from that condition.  Further, she ignored both Fly's testimony that he had to elevate his legs and his physician's recommendation that he do so.  Although Fly's cellulitis may have improved or resolved after an extended course of antibiotics, his chronic leg pain and swelling is a separate issue, and separate from his knee pain also.

The ALJ also erred in discrediting Fly's subjective complaints of shoulder pain, chest pain, shortness of breath, and lack of cognitive ability and problems with social interaction

---

[13]Venous insufficiency is inadequate drainage of venous blood from a part, resulting in edema or dermatosis.  Stedmans Medical Dictionary 205100 (27th ed. 2000), *available at* Westlaw STEDMANS.

and anger management.  All of those complaints are supported by objective evidence in the record and all place additional limitations on Fly's ability to perform work that exists in the national economy.  Medical records show repeated visits to primary care doctors with long-standing complaints of pain and Fly has undergone several procedures and tests.  Those doctor visits and procedures lend credence to his subjective complaints.  Also, the ALJ placed inordinate weight on Fly's failure to use pain medications in discounting Fly's credibility.  There is no evidence that pain medication would alleviate the edema and venous insufficiency.  The record does not support the ALJ's statement that Fly had "admitted ability to control his pain by non-medicinal means."  The record shows only that his doctor discussed "symptomatic relief."  Moreover, Fly's daily activities are not inconsistent with chronic, severe pain.

Further, the ALJ mischaracterizes the record and places inordinate emphasis on inconsequential or unimportant facts and offhand references.  Fly's treating physician's reference to "poor effort" is meaningless in the context of the doctor's later conclusion that Fly was "weak all over."  Fly's treating psychiatrist's recounting of Fly's statements about "having special powers" and "manipulating the legal system," in context, relate more to the findings of grandiosity or delusions, than to showing a lack of credibility.

The evidence of record does not support the conclusion that Fly could perform light work in the national economy.  The vocational expert's testimony to that effect was based on the assumption that Fly could stand, sit, or walk for six hours out of an eight-hour day.  There is no support for that conclusion in the record.  It is based on the testimony of a consulting physician who did not examine Fly and that does not constitute substantial evidence on which to base a finding of no disability.

24

The evidence in the record as a whole supports the conclusion that Fly is capable of only sedentary work.  If Fly were found capable of only sedentary work, considering his age, education, work experience and residual functional capacity, the Medical-Vocational Guidelines would direct a finding that he is disabled.

Moreover, the ALJ did not consider the combined effects of Fly's acknowledged severe impairments.  The record is replete with medical evidence that shows that Fly suffers leg pain and swelling, is morbidly obese, is moderately limited intellectually, and has a mental illness or illnesses that interfere with his ability to interact with people appropriately.  The ALJ's hypothetical to the vocational expert did not capture the concrete consequences of his disabilities.  The record shows that Fly was diagnosed with several mental illnesses in addition to borderline intellectual functioning and there is credible evidence that he was committed to mental institutions in the past.  The ALJ's finding that Fly had severe impairments that did not meet the listings and that Fly retained the RFC to do light work was based solely on the opinion of a consulting physician who reviewed Fly's medical records.

The court finds that the record as a whole does not contain substantial evidence to support the ALJ's conclusion that Fly can perform light work in three occupations.  The court sees no reason to further prolong this case.  Reversal and remand for an immediate award of benefits is the appropriate remedy where the record overwhelmingly supports a finding of disability.  *Pate-Fires v. Astrue*, 564 F.3d at 947; *see also Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir.1984) ("Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate.").  Here, the clear weight of the

evidence fully supports a determination that Fly was disabled within the meaning of the

Social Security Act as of October 10, 2006, and is entitled to benefits as of that date.

Accordingly, the decision of the ALJ is reversed and this action is remanded to the

Commissioner for an award of benefits.

IT IS ORDERED:

1.   The decision of the ALJ is reversed.

2.   This action is remanded to the Commissioner for an award of benefits.

3.   A final judgment will be entered in accordance with this memorandum opinion.

DATED this 31st day of August, 2011.

BY THE COURT:


s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.